ROBBINS et al. v. WINTERS CREEK
CANAL CO. et al.
No. 11529.

Circuit Court of Appeals, Eighth Circuit.
Feb. 23, 1940.

Thomas M. Morrow, of Scottsbluff, Neb.
(William Morrow, of Scottsbluff, Neb.,
and James P. Mackel, of Los Angeles, Cal.,
on the brief), for appellants.

Roscoe T. York, of Scottsbluff, Neb.
(James G. Mothersead, of Scottsbluff,
Neb., on the brief), for appellees.

Before GARDNER and WOOD-
ROUGH, Circuit Judges, and MOORE,
District Judge.

WOODROUGH, Circuit Judge.

The plaintiffs in this suit are non-resi-
dents of Nebraska, owning a minority of
the capital stock of the Winters Creek
Canal Company, a Nebraska corporation;
and the defendants, residents of Nebras-
ka, are the corporation, its officers and all
of the stockholders other than the plain-
tiffs, excepting two upon whom service of
process could not be had because they
reside without the state. There is diver-
sity of citizenship between the parties and
jurisdictional amount is involved. The
object of the suit is to compel the corpora-
tion to exact higher charges for the car-
riage of water through its canal, plaintiffs
claiming that the present low rates pro-
duced no profit and will result in confisca-
tion of the value of their stock. The case
was referred to a master who heard the
evidence and reported the same to the

court, together with his synopsis thereof, and his findings of fact, conclusions of law, and his recommendation that the suit be dismissed with costs. Plaintiffs' objections to the report were overruled and plaintiffs appeal from the final order of dismissal.

The corporation owns, maintains and operates an irrigation canal from which underlying lands are irrigated with water diverted from the North Platte River and from Winters Creek into which the river water has seeped. Neither the lands irrigated nor the irrigation water belongs to the corporation. Under the Nebraska law the water rights are appurtenant to the lands. The corporation has appropriation and diversion rights and the privilege of performing the service of delivering the water to those who have the right of user. For the performance of such service it is entitled to and does exact charges from the water users, fixed each year at a certain amount per acre of land irrigated during the year. The acreage served for which the corporation has collected rates has varied from year to year between 1920 and 1934, from 2,767 acres to 3,419 acres, the number of acres during 1934 being 3,379; during 1935, 3,419, and during 1936 slightly in excess of 3,400.

The irrigation enterprise was initiated in 1887 and the original headgate and canal were completed in 1897 by a corporation known as Winters Creek Irrigation Company. It was then contemplated that about eight thousand acres of land would be irrigated from the canal, but that and other hopes of the company were disappointed. The defendant corporation was organized in 1911 to take over the property and carry on the business of the original company and defendant has operated continuously since that time. The amount of the capital stock of defendant fully issued and outstanding is approximately $100,000, divided into shares of $100 each, and the plaintiffs are the owners of 306 of the shares which came to them by descent from their father, Edward F. Robbins. Mr. Robbins owned stock in the predecessor corporation and received the 306 shares in exchange therefor, and during the whole period of such stock ownership by Mr. Robbins and his descendants neither the original corporation nor the defendant succeeding it have ever paid any dividends to the stockholders.

The gist of the claim of the plaintiffs is that such failure to pay dividends on the corporate stock has been brought about by fraud on the part of the majority stockholders and the officers elected by them. Plaintiffs have not charged any individual stockholder or officer with any wrongful act of conversion or misapplication of any corporate assets or funds and seek no recovery from any or all of them by way of special or general damages for any act or omission claimed to be fraudulent. On the contrary, it is clearly established that throughout the long course of the defendant's operation of its canal its management has been economical and efficient. When it took over from the original corporation, it was obliged to and did assume a debt of nearly ten thousand dollars. The canal and works were then in dilapidated condition and large amounts were borrowed, $45,000 in 1911 and $13,000 additional in 1918. The works were to a great extent made over and the value of the physical property has been brought to a sum nearly equal to the par value of defendant's outstanding stock. All moneys borrowed have been repaid with interest and the corporation is free from indebtedness.

During the years when the corporation was repaying principal and interest upon the money borrowed for reconstruction work, the charges for water service to the water users were increased and sufficient sums were collected from them to discharge the large debts incurred for reconstruction and to maintain and operate the property. No assessments were ever made upon the stockholders.

After the indebtedness had been discharged in the latter part of the year 1926, the rates charged the water users were lowered during the ensuing years. The rate charged for 1926 was $2 per acre and that charged for 1927 was $1.25 per acre. The following year it was fixed at $1 per acre and in subsequent years up until 1937 further small reductions were made, the lowest rate being 60 cents per acre in 1935. This was raised to 80 cents per acre in 1936. These reduced rates were merely sufficient to maintain and operate the plant and provided no profits during that period out of which dividends could be paid to stockholders.

Nearly all of the stockholders of defendant corporation, including the plaintiffs, own lands and water rights under

the canal and are users of the water service. In addition to such stock owning landowners, the corporation delivers the water to other landowners who have water rights but no stock in the corporation. About one-third of the total acreage irrigated from defendant's canal belongs to owners who have no stock in the corporation, the charge made for the water service being at the same rate per acre to all users alike.

The plaintiffs charge that the interests of the stockholders of the Canal company and the consumers of water from the canal are diametrically opposed to each other, in that such stockholders are interested in having the company collect sufficient water rates to earn profits and pay dividends, while the users of the water are interested in having the water carried to their lands at the lowest possible rate. Plaintiffs allege that the defendant Imperial Land Company owns 582 acres of land irrigated from the canal and 204 shares of stock in the defendant corporation. The land company is a subsidiary of the Great Western Sugar Company which has a large beet sugar factory in the territory under the canal, and the plaintiffs charge that the sugar company, controlling the land company, has through the officers of that company influenced the landowning water using stockholders of defendant company to act as a unit in electing officers and has dominated and controlled the policies of the defendant company. The plaintiffs charge that by reason of the conflict of interests between the sugar company, its subsidiary and the other stockholders of the defendant corporation who are water users, on the one side, and the corporation itself on the other side, a fiduciary relationship results between those who control the defendant corporation and the minority stockholders; that the majority stockholders and the directors elected by them have been guilty of constructive fraud in failing to fix and collect sufficiently high rates to gain corporate profits and provide for dividends to stockholders. Plaintiffs prayed that the value of the corporation's property be ascertained; that it be determined what rate must be charged the water users in order to maintain and operate the property and also yield profits sufficient to pay dividends reasonably commensurate with the value of the property owned by the corporation, and that defendants be enjoined for the future from charging the water users less than a minimum necessary to produce such profits,

The corporation and its directors answered the bill of complaint and joined issue on plaintiffs' charge that the corporation or its policies were dominated or controlled by the sugar company. They denied that the interests of the canal company's stockholders and the users of water from its canal are opposed and alleged that such interests are mutual and that the prosperity and success of the water users is necessary to the well-being of the corporation. They denied the adoption of any policy to prefer the interests of water users over those of stockholders and alleged that the corporation's charges for delivering the water were honestly fixed each year in good faith for the best interest of the canal company in accordance with the best judgment of those properly in control of its affairs, upon consideration of the value of the service performed, the ability of the consumers to pay, the possible competition by the use of pumps and the safety and security of the company. The answer contained no assertion that the corporation is a mutual company or without obligation to earn profits for the stockholders when according to sound judgment the circumstances will permit.

The master found that in fixing rates for the carriage of water the directors and majority stockholders of the canal company had at all times been acting in good faith and in the exercise of honest judgment; that there was no evidence to show that either of them had been guilty of any fraud in fixing such rates; that they had fixed such rates as they believed, in the exercise of honest judgment, would be for the best interests of the company and all of its stockholders, and that the rates fixed were fair and reasonable to the users of the water, all of the stockholders and to the corporation itself. Such findings, having been sustained by the trial court after consideration of the objections against them, may not be set aside unless clearly erroneous. Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c.

The appellants here complain that the master made no finding that the holders of the majority of the canal company stock have an interest opposed to the interest of the corporation, and that they have combined to further their interest against the corporation's interest.

■ The appellants' position here is as it was in the court below, that the holders of the majority stock are so situated by reason of their water rights and land holdings that they will gain by it in dollars and cents if the canal company's charges for water service are kept down to the bare cost of maintenance and operation of the canal. That the majority stockholders will not benefit financially if rates and collections are increased so as to yield profit to the company and dividends to stockholders.

The contention does not involve determination upon conflicting evidence. The amount of stock owned by the several stockholders and the acreage for which they are respectively charged water rates is shown by the undisputed record and there was no issue for the master. It is simply a matter of mathematical computation. The parties engage in some dispute in the briefs as to the details of the computation, but the plaintiffs and the defendant Imperial Land Company together own 510 shares, more than a majority of the voting stock of the corporation. They own 662 acres of land. If they vote together and cause a dollar per acre more rates to be collected, they will have to pay $662 additional rates, but their stockholdings would entitle them to a share in the increased collection amounting to more than fifty per cent of one dollar per acre on the total acreage served and manifestly they would be gainers. The acreage served has varied from year to year and such variations may be expected in the future. There is no evidence that the water right owners are obliged to irrigate to the extent of their rights. The evidence indicates that absent any conflicts with water users or abnormal happenings, the company may fairly expect to service about four thousand acres, or in the proportion of about four acres to each share of stock. Less than a hundred shares of stock appear to be owned by persons whose holdings of land served with the water equal or exceed four acres to one share of stock. The evidence therefore does not support the appellants' contention that the majority stockholders would not gain by increased corporate revenues or that they have the alleged interest opposed to the interest of the corporation.

■ Nor was it shown that the sugar company as the parent company of the Imperial Land Company was interested adversely to the canal company. The sugar company is interested that large sugar beet crops should be raised in the territory, but the canal company shares in that same interest. Neither company can succeed without such crops. If the water service rates are raised too high, so that the irrigated acreage and the crop is diminished, that interest shared by both companies will undoubtedly suffer. But there is no evidence that the sugar company has any interest to prevent the canal company from making a reasonable profit out of its operations. It is not shown that the sugar company as a beet buyer would make or lose at its sugar factory from the raising or lowering of the rates of water service except as such raising or lowering might affect the amount of land that would be irrigated. The canal company can deliver water to only a limited acreage and the suit of the minority stockholders is based on the claim that the acreage will be irrigated whether the rates are raised or not. If that were so, then the sugar company would have no interest in the rates except as increased rates would produce for it a gain from the stockholding of its subsidiary, Imperial Land Company. The position of the canal company is that raising the water rates would, or might, honestly be expected to result in diminished irrigated acreage to the mutual injury of the canal company and the sugar company. A diametrically opposed interest on the part of the two companies can not be found on either theory of the case. The principles followed by the courts in cases where it is shown that those who have control of a corporation through majority stock ownership or otherwise, are misapplying the corporate property to their selfish personal advantage as opposed to the corporate advantage, are not relevant. The ratio of stockholdings to landholdings differs among the parties—some have stock and little or no land, and some have more acres of land than shares of stock. The plaintiffs and their ancestor have been in both positions. The ownership of more stock than lands might incline the owner to vote in favor of the company taking bold risks to earn profits, and more land ownership might induce greater caution. The policies must be honestly worked out within the corporation, and when so arrived at may not be controlled by the court.

■ As neither the majority stockholders nor the sugar company with its subsidiary were shown to be financially inter-

ested against the canal company, the master rightly directed his inquiry to the question whether the failure of the canal company to earn profits for the payment of dividends was caused by any fraud in the past conduct of the company affairs, or whether any fraud was threatened which ought to be prevented. His findings against the charges of fraud are fully sustained by the evidence. The enterprise carried on by the canal company and its predecessor corporation has been continuously from the beginning fifty years ago, and is today, surrounded with many hazards, risks and difficulties, clearly portrayed by the evidence, too numerous to detail. The rates charged during the period from the organization of the defendant corporation in 1911 up until the indebtedness was paid off in 1926 had constituted such heavy burden upon the farmers that ordinary prudence on the canal company's part dictated a relaxation of the load during the later period when, as one witness testified, "the farmers in the territory were having a hard time financially. They could not raise money and it just kept them digging to make their payments." The appellants themselves now own eighty acres of the land irrigated from the defendant's canal, and although they have had the land in the hands of an agent who is a skilled and competent agriculturist and they have had the benefit of the lower water service charges, the income from it has been very small. The exact figures are not shown, but less than three per cent on the value. The agent gave evidence of the value of potential yields of the lands in the territory to justify the imposition of higher charges for water service. Although the testimony was not contradicted, it did not establish fraud on the part of the canal company's directors in failing to raise the service charges. They properly had regard to many other considerations in addition to what it might theoretically be possible to produce from the lands.

Finding that neither the majority stockholders nor the directors of the canal company had been guilty of any fraud, the master made copious references to the numerous cases in which the law has been firmly settled that the courts can not at the instance of minority stockholders interfere with the legitimate control of corporate affairs by the officers duly elected by the majority stockholders. In this case it was their judgment and that of the majority stockholders that the interests of the canal company were best served by holding firmly to the property accumulated for the company and freed of debt by the receipts from its water users and by maintaining and operating the property without profits for dividends during the period in question. It was shown that managerial, engineering and accounting services essential to the canal company's operations and maintenance were rendered without charge to it throughout its existence, and it never has had to pay any officer's salaries. It is also clear that if the company's conduct of its affairs should be changed through outside compulsion and its rates raised against the will of the majority of its stockholders, this voluntary contribution of gratuitous service would cease. When regard is had to the hazards incident to the canal company's operations, the very limited land acreage it can serve, the few land owners upon whom it must rely for its income, its dependence upon their co-operation and good will, and the whole history of the enterprise, it is clear that the failure of this company to produce profits for dividends even through a considerable period raises no implication of fraud on the part of the management. No sufficient grounds were present for any mandatory order which would substitute court control of the corporation for that of its proper officers.

It appears that after this suit was commenced the stockholders and directors of the canal company did cause an important change to be made in the policy of the company in respect to the laterals by which the water is led from the main canal to the irrigable lands at a distance. During many years the laterals had been in the hands of the landowners themselves. They built them up and took care of them at their own expense with the result that much water, after it left the canal, was diverted upon lands for which no rates were paid to the canal company. In 1937 the canal company determined to take over all the laterals and has incurred expense for that purpose. The rates for the years 1937 and 1938 were increased to meet the cost, and the property of the company will be augmented by the acquisitions. It may be expected that collection of the water rates will in the future conform more closely to the acreage actually served than was the case in some past years. The action was taken with the approval of the stockholders and the raise in water rates

was consented to by them. Possibly the activities of the minority stockholders stimulated the correction of the conditions in respect to the laterals. If so, the change which was brought about illustrates the opportunities open to the minority stockholders to preserve their rights within the corporation. They need less than two hundred shares of stock to be voted with their own in order to constitute a majority vote in the corporation.

 The argument has been presented here for the appellees that the Winters Creek Canal Company is a de facto mutual company, not obligated to earn profits for dividends.[1] No defense on that ground was pleaded, and the master indicated his opinion that the duty at all times rested upon those in charge of the affairs of this corporation to use their best efforts to earn corporate profit to the full extent sanctioned by their judgment as to the course that is for the best interests of the company. The decree appealed from was upon that basis, as is the decision of this court. It has not been pointed out in the argument that the principles which control decision would be different if the canal company were a mutual company. It certainly is not a philanthropic or eleemosynary company. It must render its services to all the holders of water rights at the same rate. One third of its service is rendered to water right owners who are not stockholders. In fixing the rates, therefore, those in charge of the company's affairs must necessarily seek to obtain profit from the company's services to the full extent compatible with the company's best interests.

As the plaintiffs' charges of fraud, past or threatened, were not established by the evidence, and no grounds exist which would justify court control of the company's business, the decree of dismissal is affirmed.

---

[1] Section 46-624, Comp.Stat. of Nebraska, 1929, provides:

"Any corporation or association organized under the laws of the state for the purpose of constructing and operating canals, reservoirs and other works for irrigation purposes, and deriving no revenue from their operation shall be termed a mutual irrigation company, and any by-laws adopted by such company prior to, or after the passage of this article, not in conflict herewith, shall be deemed lawful and so recognized by the courts of this state: Provided, such by-laws do not impair the rights of one shareholder over another."

In Swanger v. Porter, 87 Neb. 764, 128 N.W. 516, it was held: "An irrigation company organized under the laws of this state, which has no source of income, derives no revenue from the operation of its ditch or canal, and conducts its business solely for the purpose of irrigating the lands of its members and stockholders, is, de facto, a mutual irrigation company as defined by section 6845, Ann.St.1909.'"